Keith Beauchamp (012434)
Shelley Tolman (030945)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue, Suite 1200
Phoenix, AZ 85004
T: 602.381.5490
F: 602.224.6020
kbeauchamp@cblawyers.com
stolman@cblawyers.com

Jonathan Sherman
(application for admission *pro hac vice* being submitted)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, DC 20015
T: 202.237.2727
F: 202.237.6131
jsherman@bsfllp.com

[Additional Counsel Listed on Signature Page]

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Vanguard Specialized Funds, on behalf of its Vanguard REIT Index Fund series; Vanguard Index Funds, on behalf of its Vanguard Mid-Cap Index Fund series, Vanguard Total Stock Market Index Fund series, Vanguard Extended Market Index Fund series, Vanguard Growth Index Fund series, Vanguard Mid-Cap Growth Index Fund series, and Vanguard Large-Cap Index Fund series; Vanguard Institutional Index Funds, on behalf of its Vanguard Institutional Total Stock Market Index Fund series; Vanguard International Equity Index Funds, on behalf of its Vanguard Total World Stock Index Fund series; Vanguard Scottsdale Funds, on behalf of its Vanguard Russell 1000 Index Fund series, Vanguard Russell 1000 Value Index Fund series, Vanguard Russell 2000 Index Fund series, Vanguard Russell | No. <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

2000 Growth Index Fund series, Vanguard
Russell 2000 Value Index Fund series, and
Vanguard Russell 3000 Index Fund series;
Vanguard Valley Forge Funds, on behalf of its
Vanguard Balanced Index Fund series;
Vanguard Variable Insurance Funds, on behalf
of its Vanguard Variable Insurance Fund REIT
Index Portfolio series and Vanguard Variable
Insurance Fund Mid-Cap Index Portfolio
series; Vanguard World Fund, on behalf of its
Vanguard Financials Index Fund series; VFTC
Total Stock Market Index Trust; VFTC Russell
1000 Value Index Trust; VFTC Russell 2000
Growth Index Trust; and VFTC Russell 2000
Value Index Trust,

                    Plaintiffs,

v.

VEREIT, Inc.; VEREIT Operating Partnership,
L.P.; Nicholas S. Schorsch; David S. Kay;
Brian S. Block; Lisa P. McAlister; Lisa
Beeson; AR Capital LLC; ARC Properties
Advisors LLC; RCAP Holdings, LLC; and
RCS Capital Corporation,

                    Defendants.

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................ 6

II.     JURISDICTION AND VENUE ................................................................... 14

III.    PARTIES ...................................................................................................... 15

        A.      Plaintiffs ........................................................................................... 15

        B.      Defendants ........................................................................................ 17

                1.      Executive Defendants ............................................................ 17

                2.      Schorsch-Controlled Defendants ......................................... 20

IV.     SUMMARY OF THE CASE ....................................................................... 23

        A.      Defendant Schorsch's REIT Empire ............................................. 23

        B.      The Significance of "Adjusted Funds from Operations" ............ 25

        C.      ARCP's Growth-by-Acquisition Campaign ................................. 30

        D.      Defendant Schorsch's Empire and ARCP's Executives Profit
                from ARCP's Acquisition Binge ................................................... 33

        E.      As Concealed from Investors, Defendants Intentionally Misstate
                the Company's AFFO ...................................................................... 37

        F.      ARCP's Audit Committee Discloses Fraud ................................. 40

        G.      Defendants Schorsch, Kay and Beeson Unexpectedly "Resign" ............... 44

        H.      ARCP Confirms That Its Internal Controls Were Faulty and That
                It Falsified Four Years of Financials ............................................ 45

V.      MATERIALLY FALSE AND MISLEADING STATEMENTS ............ 48

        A.      ARCP's IPO ...................................................................................... 49

        B.      Third Quarter 2011 Financial Results .......................................... 50

        C.      Fourth Quarter 2011 Financial Results ........................................ 51

        D.      First Quarter 2012 Financial Results ............................................ 52

        E.      Second Quarter 2012 Financial Results ....................................... 53

{00187807.1 }

F.      Third Quarter 2012 Financial Results ........................................................... 55

G.     ARCT III Merger ............................................................................................ 57

H.     January 2013 Equity Offering ....................................................................... 61

I.       Fourth Quarter and Year-End 2012 Financial Results................................ 61

J.       First Quarter 2013 Financial Results............................................................ 65

K.     CapLease Acquisition Announcement ......................................................... 69

L.      ARCT IV Merger Announcement.................................................................. 70

M.    July 2013 Investor and Analyst Day ........................................................... 72

N.     Second Quarter 2013 Financial Results ...................................................... 74

O.     Cole Merger Announcement ......................................................................... 77

P.      Third Quarter 2013 Financial Results .......................................................... 82

Q.     Cole Merger Presentation.............................................................................. 85

R.      ARCT IV Merger Proxy Materials .............................................................. 85

S.      Cole Merger Proxy Materials ....................................................................... 88

T.      ARCT IV Merger Closing ............................................................................. 93

U.     Cole Merger Closing ..................................................................................... 93

V.      Fourth Quarter and Year-End 2013 Financial Results................................ 97

W.    First Quarter 2014 Financial Results.......................................................... 106

X.      May 21, 2014, Stock Offering..................................................................... 111

Y.      REIT Week Investor Forum ........................................................................ 114

Z.      June 20, 2014, Stockholder Memorandum ................................................. 115

AA.   Second Quarter 2014 Financial Results ..................................................... 115

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER ............................................. 124

VII.    PLAINTIFFS' RELIANCE................................................................................. 133

VIII.   LOSS CAUSATION ........................................................................................... 135

IX.    CLAIMS FOR RELIEF.......................................................................................136

COUNT 1:  FOR VIOLATION OF THE ARIZONA CONSUMER FRAUD
ACT ........................................................................................................................136

COUNT 2:  FOR AIDING AND ABETTING VIOLATIONS OF THE
ARIZONA CONSUMER FRAUD ACT .......................................................137

COUNT 3:  FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE
ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER............................138

COUNT 4:  VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT
AND SEC RULE 14A-9 PROMULGATED THEREUNDER ......................................139

COUNT 5:  VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT .............141

COUNT 6:  VIOLATION OF SECTION 11 OF THE SECURITIES ACT .................141

COUNT 7:  VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES
ACT ........................................................................................................................143

COUNT 8:  VIOLATION OF SECTION 15 OF THE SECURITIES ACT .................145

X.     PRAYER FOR RELIEF.................................................................................146

XI.    JURY TRIAL DEMAND................................................................................146

Plaintiffs, all trusts and investment companies affiliated with The Vanguard Group, Inc. (together with Plaintiffs hereafter, "Vanguard"), bring this action under the Arizona Consumer Fraud Act ("ACFA"), the Securities Act of 1933 ("Securities Act"), and the Securities Exchange Act of 1934 ("Exchange Act") to recover damages for losses Plaintiffs suffered in connection with their purchases and acquisitions of the common stock of American Realty Capital Properties, Inc. ("ARCP" or the "Company"), from February 13, 2012, through October 31, 2014 ("Relevant Period").  (ARCP now calls itself VEREIT, Inc.)  Plaintiffs allege the following upon personal knowledge as to their own acts and upon information and belief as to all other matters.  Their information and belief are based on, among other things, the investigation conducted by their counsel.

## I.    <u>INTRODUCTION</u>

1.    This case arises from a multi-year fraud and attempted cover-up orchestrated by the top corporate executives of ARCP, one of the largest real-estate investment trusts ("REITs") in the world.  Once it disclosed the fraud and attempted cover-up, the Company restated its prior financials for seven consecutive reporting periods and terminated its founder, top officers and the majority of its Board of Directors. The Company's stock price plummeted by over 36% in response to the Company's disclosure of the fraud and attempted cover-up, causing Plaintiffs and other investors to lose billions of dollars.

2.    Defendant Nicholas Schorsch founded ARCP in 2010.  He acted as Chief Executive Officer ("CEO") until October 1, 2014, and as Chairman throughout the Relevant Period.  He took the Company public in September 2011.  Thereafter, he and

others began to acquire real-estate companies on the premise that they would help grow ARCP. The true primary purpose in Schorsch's buying spree, however, was to rob from shareholders and to give to himself and his friends: Schorsch transferred hundreds of millions of dollars to entities owned or controlled by him and by other senior insiders. As part of this so-called acquisition strategy, ARCP purchased seven major real estate companies between February 2013 and July 2014 at an average price of over $3 billion. ARCP's largest and by far its most important transaction was acquiring Arizona-based rival Cole Real Estate Investments, Inc. ("Cole") for $11.2 billion. As a result of these acquisitions, ARCP ballooned from a moderate-sized company comprising $132 million worth of assets at year-end 2011 to a real-estate empire of $21.3 billion in assets by mid-2014.

3.     Throughout this growth period, ARCP assured investors that its internal controls were effective and that its financial statements were accurate and could be trusted. Analysts and investors relied on those representations, devoting particular attention to the Company's reported "Adjusted Funds From Operations" ("AFFO"). AFFO is a common financial metric used by investors to evaluate the financial health of a REIT. The industry often analogizes its purpose to "earnings per share." ARCP stressed its AFFO figure to investors during the Relevant Period. It stated that AFFO provided a basis upon which investors could "assess the sustainability of our operating performance."

4.     Each quarter, ARCP touted its AFFO, which regularly exceeded analysts' estimates and outmatched its competitors. On August 1, 2012, for example, ARCP

reported AFFO for the third quarter of 2012; it was over 100% greater than the AFFO ARCP had reported for the second quarter of that year.  On May 6, 2013, ARCP reported AFFO of nearly $31 million for the first quarter of 2013, a 811% increase from the prior quarter.  On November 7, 2013, ARCP reported AFFO of $47 million for the third quarter of 2013, a 42% increase from the prior quarter.  On February 27, 2014, the Company reported record financial results, with a fourth quarter AFFO of $56 million, dwarfing analysts' estimates and more than 150% greater than the corresponding prior-year period.  On May 8, 2014, the Company reported a record-high AFFO of $147 million for the first quarter of 2014, which was 330% greater than what it had reported for the same period in 2013.  Finally, on July 29, 2014, the Company reported yet another record-high AFFO of $205 million for the second quarter of 2014, which was 429% greater than what it had reported for the same period in 2013.  Analysts and investors applauded the Company for the purportedly exceptional results, calling ARCP "one of the most compelling investment opportunities across the REIT sector."

5.     Contrary to representations made to investors, and from the very beginning of its history as a public company, ARCP lacked an adequate system of controls over its financial reporting.  ARCP's financial statements were riddled with errors that served not only to mask its faltering performance but to make that performance appear exceptional.  ARCP's false financial reporting culminated with a miscalculation of its AFFO that incorporated adjustments to AFFO for interests that did not belong to ARCP at all.  This improper calculation allowed ARCP to inflate its AFFO materially, and gave the Company access to additional capital to continue its acquisition spree.

6.      The Company's acquisitions (and the accounting fraud that accompanied them) enabled Schorsch and other senior ARCP insiders to reap hundreds of millions of dollars in improper transaction fees, commissions, and compensation.  The payments included, for example, more than $15 million in "post-transaction support services"; more than $2 million in "financing coordination fees"; more than $20 million attributable to the purported sale to the Company of "furniture, fixtures, and equipment" (for which "no evidence" was found substantiating at least a third of such property); more than $60 million for "strategic advisory services"; more than $175 million in payments for "subordinated distribution fees"; and more than $300 million in "commissions and fees." As the Company later admitted, the accounting scheme increased the bonus pool for these same executives by nearly $100 million in excess of any authorization.  All told, ARCP insiders and their affiliates used the "growth by acquisition" strategy to steal in excess of a billion dollars of capital that but for the fraud they would not have received.

7.      ARCP hid its fraud from investors until October 29, 2014.  On that date, the Company stunned the market by issuing a press release disclosing the results of an internal investigation conducted by its Audit Committee.  With the assistance of independent counsel and forensic experts, the Audit Committee had determined that the Company "intentionally" misreported and "intentionally not corrected" certain AFFO calculations and that prior statements by the Company "should no longer be relied upon." The Audit Committee also revealed, contrary to prior representations, that the Company's internal controls over financial reporting were defective and announced that the

Company's CFO, Defendant Block, and its CAO, Defendant McAlister, had been terminated.

8.      The Company's October 29 revelations caused the Company's stock price to drop 19% from the prior day's close.  Within hours of the disclosure, numerous securities analysts slashed their ratings and cut their price targets for the Company, expressing outrage that ARCP and its executives engaged in such "highly disappointing" misconduct.

9.      Over the next three days, the Company's stock price continued to fall as a result of its admitted accounting fraud.  On October 29, 2014, The Wall Street Journal reported that the SEC had initiated a civil investigation into the Company's accounting improprieties.  Shortly thereafter, Reuters reported that the FBI and federal prosecutors opened their own probes.  On November 3, 2014, RCS Capital Corporation – which previously had agreed to purchase an ARCP subsidiary at a steep premium – cancelled the parties' contract due to the October 29 disclosures.

10.      During the three trading days immediately following ARCP's October 29 revelations, the Company's stock lost over 36% of its value.

11.      More and new material information came to light still later.  The Company's former Chief Accounting Officer ("CAO"), Lisa Pavelka McAlister, filed a verified complaint in New York state court setting forth the Company's accounting fraud in detail.  Defendant McAlister, who had purportedly resigned from the Company because of her role in the wrongdoing, sued Defendant Schorsch, ARCP's former President, Defendant David S. Kay, and the Company itself.  She claimed that

Defendants had defamed her and terminated her for reporting accounting malfeasance while still at the Company.  McAlister's complaint confirmed that the fraud was deliberately orchestrated from the very top of the Company.  In it, McAlister explained that an undisclosed change to the Company's method for calculating AFFO – from "net" to "gross" basis – was made "suddenly and without any apparent justification or basis." The purpose of the change, McAlister admitted, was simple:  "to avoid public disclosure of [ARCP's] faltering financial performance."    Defendants Schorsch and Kay and former Chief Financial Officer ("CFO"), Defendant Brian S. Block, had, she alleged under oath, "ordered" this change.  As McAlister explained, Schorsch instructed Block "to take steps that would cover up the improper change in accounting," including by altering ARCP's financial statements in ways that would make it "more difficult for stockholders to see the fraudulent" accounting.

12.     On March 2, 2015, after a four-month delay, the Company announced the final results of its investigation.  The Company admitted that it had falsified its reported operating performance for every reporting period since it went public in 2011, and officially restated nearly three years of its prior financial statements.  This restatement was necessary as a result of a host of misrepresentations in ARCP's financial statements, including serious and serial misapplication of U.S. Generally Accepted Accounting Principles ("GAAP").

13.     The Company's audit committee and outside auditor later confirmed that, as disclosed on October 29, 2014, the Company's prior financials "should no longer be relied upon" because they encompassed dozens of accounting tricks intended to inflate

AFFO or to line executives' pockets, or both.  These artifices included the repeated (i) improper accounting for non-controlling interests; (ii) misclassification of recurring general and administrative expenses as non-recurring, merger and other non-routine transaction-related expenses; (iii) delay of expense recognition based on when they would have the least detrimental impact on reported AFFO; (iv) improper use of goodwill from acquisitions as a slush fund to absorb losses from the subsequent sale of individual properties; (v) wholesale exclusion of selected expenses; and (vi) employment of improper and arbitrary metrics for determining executive compensation thus increasing the executive bonus pool.  Highlights from the disclosures include:

- AFFO was materially overstated for 2011 (by 7.2%), 2012 (by 2.3%), 2013 (by 23%), first quarter 2014 (by 35%) and second quarter 2014 (by 10.4%);

- The Company admitted that its internal controls over financial reporting and its disclosure controls were not effective as of December 31, 2013, March 31, 2014, June 30, 2014, and September 30, 2014;

- Prior to the first quarter of 2014, members of senior management "were aware of [the accounting] errors but allowed [the 1Q 2014] report to be filed without completing an analysis of the errors";

- The Company admitted that it made compensation awards to Schorsch and Block that "were more favorable to them than the [Compensation Committee] had authorized"; and

- The Company admitted it made $8.5 million in "inappropriate" payments to ARC Properties Advisors, a management company controlled and owned by Schorsch.

14.     Following the Audit Committee's investigation, and acknowledging the existence of numerous material misstatements in its prior filings, ARCP restated its financial results for 2012, 2013, and the first two quarters of 2014 – that is, ten fiscal quarters and seven consecutive reporting periods.

15.     Within six weeks of the October 29 disclosure, every senior executive employed by the Company through the end of the  Relevant Period – its Chairman, CEO, CFO, CAO and Chief Operating Officer ("COO") – had been terminated or asked to leave the Company.

16.     The fraudulent accounting and the complete lack of effective internal controls at ARCP stood in stark contrast to its public representations and assurances to investors during the Relevant Period.  Defendants' repeated misstatements and material omissions provided a false portrayal of the Company's financial health and the effectiveness of its internal controls, and caused ARCP stock to trade at artificially inflated prices throughout the Relevant Period.

17.     But for Defendants' repeated material misrepresentations, Plaintiffs would not have purchased ARCP shares in the quantities, or at the prices, at which they did. When the truth about ARCP's financial performance, internal control deficiencies, and pervasive accounting fraud was revealed to the market, the artificial inflation in ARCP securities was removed, causing Plaintiffs to suffer losses on their investments in the Company.

18.     Through this action, Plaintiffs assert claims under the Arizona Consumer Fraud Act, the Securities Act, and the Exchange Act to recover their losses incurred in connection with their investments in ARCP stock.

## II.   <u>JURISDICTION AND VENUE</u>

19.   This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

20.   The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

21.   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  The acts and conduct described in this Complaint, including the dissemination of false and misleading statements and information, occurred in substantial part in this District.

(a) By far the largest acquisition in the acquisition binge at the heart of Defendants' fraudulent scheme – a deal that Defendant Schorsch described as "epic" – was ARCP's acquisition of Cole on February 7, 2014, for $11.2 billion.  Cole had been headquartered in Arizona, at 2325 East Camelback Road, Suite 1100, Phoenix, AZ 85016.

(b) Following ARCP's acquisition of Cole, ARCP operated its business using Cole's former offices in Arizona.  During the time period when ARCP was operating its business using Cole's former offices in Arizona, ARCP made misrepresentations that are a significant part of the basis for Plaintiffs' claims.  Those misrepresentations addressed the financial performance of ARCP's entire business, including its business from the assets acquired from Cole.

(c) The Executive Defendants (as defined in ¶ 31) spent a significant amount of time in Arizona and performed work for ARCP in Arizona.  In November 2013, Defendant McAlister (who is a licensed CPA in Arizona, and who had previously worked for an accounting firm in Phoenix) stated that she, Defendant Block, and others would be "spending a lot of time" in Arizona.  ARCP executives had offices in Phoenix, and Defendant Kay stated in February 2014 that he, Defendant Block, and Defendant McAlister were "regularly in Phoenix" and spending a "significant amount of time" in Phoenix.  During her time at

ARCP, Defendant Beeson traveled domestically "40% of the time" and that included work to "oversee the ARCP team in Phoenix."

(d) ARCP is now headquartered in Cole's former offices in Arizona.

(e) Vanguard itself has (and, throughout the Relevant Period, had) an office in Scottsdale, Arizona, employing over 2000 people.

(f) The individual investors in Vanguard's funds, who ultimately suffered the losses caused by Defendants' wrongdoing and for whose ultimate benefit Plaintiffs bring this lawsuit, include Arizona residents.

## III.    PARTIES

### A.    Plaintiffs

22.    Plaintiffs are Vanguard-affiliated trusts and investment companies that

suffered losses on their purchases of ARCP common stock during the Relevant Period:

(a) Vanguard Specialized Funds, on behalf of its Vanguard REIT Index Fund series.  Vanguard Specialized Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

(b) Vanguard Index Funds, on behalf of its Vanguard Mid-Cap Index Fund series, Vanguard Total Stock Market Index Fund series, Vanguard Extended Market Index Fund series, Vanguard Growth Index Fund series, Vanguard Mid-Cap Growth Index Fund series, and Vanguard Large-Cap Index Fund series.  Vanguard Index Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

(c) Vanguard Institutional Index Funds, on behalf of its Vanguard Institutional Total Stock Market Index Fund series.  Vanguard Institutional Index Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

(d) Vanguard International Equity Index Funds, on behalf of its Vanguard Total World Stock Index Fund series.  Vanguard International Equity Index Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

(e) Vanguard Scottsdale Funds, on behalf of its Vanguard Russell 1000 Index Fund series, Vanguard Russell 1000 Value Index Fund series, Vanguard Russell 2000 Index Fund series, Vanguard Russell 2000 Growth Index Fund series, Vanguard Russell 2000 Value Index Fund series, and Vanguard Russell 3000 Index Fund series.   Vanguard Scottsdale Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

(f) Vanguard Valley Forge Funds, on behalf of its Vanguard Balanced Index Fund series.  Vanguard Valley Forge Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

(g) Vanguard Variable Insurance Funds, on behalf of its Vanguard Variable Insurance Fund REIT Index Portfolio series and Vanguard Variable Insurance Fund Mid-Cap Index Portfolio series.   Vanguard Variable Insurance Funds is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

(h) Vanguard World Fund, on behalf of its Vanguard Financials Index Fund series.  Vanguard World Fund is a Delaware statutory trust registered with the SEC under the Investment Company Act of 1940 as an open-ended management investment company.

(i) VFTC Total Stock Market Index Trust, a Pennsylvania trust that was organized by its trustee, Vanguard Fiduciary Trust Company ("VFTC"). VFTC is a Pennsylvania corporation and trust company registered under Pennsylvania banking laws.

(j) VFTC Russell 1000 Value Index Trust, a Pennsylvania trust that was organized by its trustee, VFTC.

(k) VFTC Russell 2000 Growth Index Trust, a Pennsylvania trust that was organized by its trustee, VFTC.

(l) VFTC Russell 2000 Value Index Trust, a Pennsylvania trust that was organized by its trustee, VFTC.

23.    Plaintiffs purchased or acquired ARCP common stock (i) on the open market and/or pursuant to or traceable to particular share offerings; and (ii) in exchange for shares of common stock of Cole pursuant to the terms of the Cole Merger Agreement.

### B.   Defendants

24.   Defendant ARCP (which now calls itself VEREIT, Inc.) is headquartered at 2325 East Camelback Road, Suite 1100, Phoenix, AZ 85016.  ARCP owns and acquires freestanding commercial real estate.  The Company's common stock was traded on NASDAQ through July 30, 2015.

25.   Substantially all of ARCP's business is conducted through its operating partnership, Defendant ARC Properties Operating Partnership L.P., which now calls itself VEREIT Operating Partnership L.P. (the "Operating Partnership"), of which ARCP is the sole general partner.  As of June 30, 2014, ARCP owned 97.3% of the common equity interests in the Operating Partnership.  ARCP and the Operating Partnership filed their June 30, 2015, Form 10-Q together, referring to both entities jointly as "the Company." The Operating Partnership is a Delaware limited partnership located at 2325 East Camelback Road, Suite 1100, Phoenix, AZ 85016.

### 1.   Executive Defendants

26.   Defendant Nicholas S. Schorsch ("Schorsch") founded ARCP in 2010.  He was its CEO until he "resigned" on October 1, 2014, and its Chairman until December 15, 2014, when he "stepped down" from the Company's Board of Directors following ARCP's October 29, 2014, disclosures.  During the Relevant Period, Defendant Schorsch reviewed, approved, and signed ARCP's false and misleading SEC filings, including the IPO Registration Statement, the Third Quarter 2011 Form 10-Q, the 2011 Form 10-K, the First Quarter 2012 Form 10-Q, the Second Quarter 2012 Form 10-Q, the Third Quarter 2012 Form 10-Q, the 2012 Form 10-K, First Quarter 2013 Form 10-Q, the Second

Quarter 2013 Form 10-Q, the Third Quarter 2013 Form 10-Q, the 2013 Form 10-K, the First Quarter 2014 Form 10-Q, the Second Quarter 2014 Form 10-Q, and signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") therein ("SOX Certifications").  Defendant Schorsch also reviewed, approved, and signed the Cole Merger Proxy and the Shelf Registration Statement.  Defendant Schorsch also reviewed and approved false and misleading press releases and signed all of ARCP's Forms 8-K issued during the Relevant Period.  Defendant Schorsch also participated in conference calls with securities analysts during which ARCP's false and misleading filings with the SEC and its press releases were presented and discussed, including on May 9, 2012, August 1, 2012, May 6, 2013, August 6, 2013, November 7, 2013, February 27, 2014, and May 8, 2014.

27.    Defendant Brian S. Block ("Block") was ARCP's CFO and Executive Vice President beginning in December 2010, as well as its Treasurer and Secretary beginning in January 2014.  On October 29, 2014, Defendant Block "resigned" from the Company. During the Relevant Period, Defendant Block reviewed, approved, and signed ARCP's false and misleading SEC filings, including the IPO Registration Statement, the Third Quarter 2011 Form 10-Q, the 2011 Form 10-K, the First Quarter 2012 Form 10-Q, the Second Quarter 2012 Form 10-Q, the Third Quarter 2012 Form 10-Q, the 2012 Form 10-K, First Quarter 2013 Form 10-Q, the Second Quarter 2013 Form 10-Q, the Third Quarter 2013 Form 10-Q, the 2013 Form 10-K, the First Quarter 2014 Form 10-Q, the Second Quarter 2014 Form 10-Q, and signed SOX Certifications.  Defendant Block reviewed, approved, and signed the Cole Merger Proxy and the Shelf Registration

Statement. Defendant Block also participated in conference calls with securities analysts, during which ARCP's false and misleading filings with the SEC and its press releases were presented and discussed, including on May 9, 2012, August 1, 2012, May 6, 2013, August 6, 2013, November 7, 2013, February 27, 2014, May 8, 2014, and July 29, 2014.

28. Defendant David S. Kay ("Kay") was ARCP's President from December 2013 until October 1, 2014, after which he replaced Defendant Schorsch as the Company's CEO and joined the Company's Board of Directors. On December 15, 2014, ARCP announced that Defendant Kay had "stepped down" as the Company's CEO and as a member of its Board of Directors. During 2013 and 2014, Defendant Kay reviewed, approved, and signed ARCP's false and misleading SEC filings, including the 2013 Form 10-K and the Cole Merger Proxy. Defendant Kay also participated in conference calls with securities analysts, during which ARCP's false and misleading filings with the SEC and its press releases were presented and discussed, including on February 27, 2014, May 8, 2014, and July 29, 2014.

29. Defendant Lisa Pavelka McAlister ("McAlister") was ARCP's Senior Vice President and Chief Accounting Officer from November 4, 2013 through October 29, 2014. As set forth in an ARCP press release, McAlister was appointed to the position of Chief Accounting Officer "to manage the accounting and financial functions of the company and aid in the integration of ARCP's recently closed and pending transactions, including working closely with the financial and senior management teams at Cole Real Estate Investments, Inc. (NYSE: COLE) to manage the financial integration of the companies." During 2013 and 2014, Defendant McAlister reviewed, approved, and

signed ARCP's false and misleading SEC filings, including the 2013 Form 10-K and the Second Quarter 2014 Form 10-Q.

30.     Defendant Lisa Beeson ("Beeson") was ARCP's COO beginning on November 7, 2013, as well as its President beginning October 1, 2014.  On December 15, 2014, ARCP announced that she had "stepped down" from both positions.  During 2013 and 2014, Beeson made the statements and took the actions detailed herein, including, participation in conference calls with securities analysts and solicitation of merger proxies, in her capacity as an officer of the Company.

31.     Defendants Schorsch, Block, Kay, McAlister and Beeson are collectively referred to herein as the "ARCP Executive Defendants" or "Executive Defendants."

## 2.     Schorsch-Controlled Defendants

32.     Defendant ARC Properties Advisors LLC ("ARC Advisors") is a Delaware limited-liability company and was ARCP's external manager during Relevant Period until January 8, 2014.  As external manager of ARCP, ARC Advisors was responsible for ARCP's "affairs on a day-to-day basis."   Pursuant to the terms of a management agreement between ARC Advisors and ARCP, ARC Advisors provided ARCP with its management team, support personnel and resources necessary to implement and execute ARCP's business and growth strategies, including the acquisition of its properties. ARCP had no employees and ARCP's CEO, President and CIO were all employed by ARC Advisors.   ARC Advisors is directly or indirectly owned and controlled by Defendants Schorsch and Block, and Defendant Schorsch served as CEO of ARC Advisors during the Relevant Period.  During the Relevant Period, ARC Advisors was

owned, operated and controlled by RCS Capital, LLC, and then AR Capital, LLC.   In
ARCP's SEC filings, ARCP stated that ARC Advisors and its parent companies had "the
power to direct the activities of [ARCP] through advisory/management agreements."
Even after ARCP purportedly transitioned to self-management on January 8, 2014,
ARCP continued to rely on ARC Advisors for at least 60 days, extendable indefinitely at
ARCP's discretion, to provide the same services that had previously been provided to
ARCP under the old management agreement.   ARC Advisors has its principal office at
405 Park Avenue, New York, NY 10022.

        33.    Defendant AR Capital LLC ("AR Capital") is a Delaware limited-liability
company that purported to provide management and advisory services to ARCP and its
affiliates.   During the Relevant Period, all of the equity interests in AR Capital were
owned by Defendants Schorsch and Block and the following other former officers and/or
directors of ARCP:  William M. Kahane; Peter M. Budko; and Edward M. Weil, Jr.  AR
Capital was directly or indirectly owned and/or controlled by Defendants Schorsch and
Block.  AR Capital also owned, operated and controlled ARC Advisors, which served as
ARCP's external manager prior to January 8, 2014, and for which Defendant Schorsch
served as CEO.  At times during the Relevant Period, ARCP was dependent upon AR
Capital and its subsidiary ARC Advisors to provide "services that are essential to
[ARCP]," including asset acquisition and disposition decisions, the sale of shares of the
Company's common stock available for issue in follow-on offerings, and accounting
services and investor relations.   In connection with the operation of ARCP, ARCP
entered into various "administrative support agreements" with AR Capital and paid AR

Capital numerous fees, including acquisition fees and financing fees.  AR Capital is located at 405 Park Avenue, 12th Floor, New York, New York 10022.  During the Relevant Period, Schorsch held executive officer positions at AR Capital and is currently co-founder, Chairman and CEO.

34.     Defendant RCAP Holdings, LLC, formerly known as RCS Capital LLC ("RCS Capital"), is a Delaware limited-liability company that operates as an investment and financial services firm.  RCS Capital's subsidiaries have included AR Capital and RCS Capital Corporation.  During the Relevant Period, Defendant Schorsch was the Chairman and CEO of RCS Capital.  Through its subsidiaries, RCS Capital offers real estate investment trust management, securities brokerage, investment banking, transaction management, program management, risk analysis and portfolio management.  During the Relevant Period, RCS Capital was owned and controlled by Schorsch.

35.     Defendant RCS Capital Corporation ("RCAP") is a Delaware corporation whose stock is traded on the NYSE using the ticker symbol "RCAP."  RCAP is an investment firm with operating subsidiaries including retail advice services, wholesale distribution, investment banking, capital markets, investment research, investment management and crowdfunding.  During the Relevant Period, RCS Capital was the sole stockholder of RCAP and then its parent company following the completion of its IPO in June 2013.  During the Relevant Period, RCAP was externally managed by RCS Capital Management, LLC, an entity directly or indirectly controlled by Schorsch, its co-CEO.  During the Relevant Period, Schorsch had "the ability to control the management and major strategic investments of [RCAP]" as a result of his position as a principal and

officer of RCS Capital Management, and as executive chairman of RCAP's board of directors, he had the "ability to control the election or replacement of [RCAP's] directors." During the Relevant Period, Schorsch and William M. Kahane controlled more than 95% of the voting rights with respect to RCAP and thereby effectively controlled all matters affecting RCAP. RCAP derived substantially all of its revenue from RCAP. In 2013, RCAP received 80% of its total revenue, approximately $713.5 million, from ARCP. RCAP is located at 405 Park Avenue, 14th Floor, New York, New York 10022.

36.    Defendants AR Capital, ARC Advisors, RCS Capital, and RCAP are collectively referred to herein as the "Schorsch-Controlled Defendants." Unless otherwise indicated, "Defendants" refers herein to all Defendants named in this action.

## IV.    SUMMARY OF THE CASE

### A.    Defendant Schorsch's REIT Empire

37.    ARCP's founder, Defendant Schorsch, entered the commercial real-estate business in 1998. In 2006, Defendant Schorsch – who has been characterized by Forbes as a "hard-charging, fast-talking real estate chief" – devised a way to accumulate substantial personal wealth. His strategy consisted of obtaining funds from investors to finance a complex web of interrelated companies, including non-traded REITs, public REITs, research and advisory firms and management companies. He raised money for his non-traded REITs, took them public, and then used those vehicles to buy out other non-traded REITs. Through his integrated real-estate empire, he collected hundreds of

millions of dollars through profit-sharing arrangements, director fees, and hidden compensation for "research and advisory services" that he provided to his related entities.

38.     In 2010, Defendant Schorsch founded ARCP and appointed himself Chairman and CEO.  He took ARCP public in September 2011 and listed the Company on the NASDAQ exchange.   ARCP owned and acquired single-tenant, freestanding commercial real-estate properties subject to "net leases."  In a net lease, the tenant pays the expenses that are traditionally borne by the landlord, such as building maintenance expenses, property taxes, and insurance.  These lease arrangements allowed ARCP to distribute the rent received from its properties, less certain fees, to its shareholders as dividends.  ARCP's tenants included many prominent commercial lessees such as Red Lobster, Walgreens, CVS, Dollar General, FedEx, Family Dollar, GSA, Albertsons, Citizens Bank, and AT&T.

39.     After taking ARCP public, Defendant Schorsch continued to operate it as part of his close-knit network of real-estate companies.  He maintained control over that network by occupying executive leadership positions at each one of his interrelated entities.  During the Relevant Period, he was the Chairman and, in some cases, CEO and President of all of his real-estate companies, including ARCP.[1]  These companies had

---

[1] During the Relevant Period, Defendant Schorsch was an officer and/or director at American Realty-related entities including the following:  AR Capital LLC (Chairman and CEO); RCS Capital Corporation (Chairman); RCS Capital Management, LLC (CEO); RCAP Holdings LLC (Chairman and CEO); American Realty Capital Global Trust, Inc. (Chairman and CEO); American Realty Capital Global Trust II, Inc. (Chairman & CEO); AR Capital Acquisition Corp. (Chairman); ARC Properties Advisors, LLC (CEO); American Realty Capital Trust V, Inc. (Chairman and CEO); American Realty Capital Daily Net Asset Value Trust, Inc. (Chairman and CEO); American Realty Capital Healthcare Trust, Inc. (Chairman and CEO); American Realty Capital Healthcare Trust II, Inc. (Chairman); American Realty Capital Healthcare Trust III (Chairman); American Realty Capital Hospitality Trust, Inc. (Chairman); American Realty Capital New York City REIT, Inc. (Chairman and CEO); New York REIT, Inc. (Chairman and CEO); American Realty Capital – Retail Centers of America II, Inc. (Chairman and CEO); ARC

overlapping boards of directors and executives, all of whom ultimately reported to Defendant Schorsch.

40.     Through this elaborate web of corporate arrangements, Defendant Schorsch directly and indirectly controlled the accounting for each of his entities, including ARCP. He also made certain that he profited personally from their operations.  Throughout the Relevant Period, he engaged in self-dealing – described to investors as "services" – through which he reaped hundreds-of-millions of dollars in compensation and fees.

### B.     The Significance of "Adjusted Funds from Operations"

41.     In evaluating ARCP's stock, investors placed significant weight on the Company's AFFO, which is a performance metric frequently used in connection with REITs.  The Company stated in its financial statements filed with the SEC that it calculated AFFO by first determining its funds from operations ("FFO") and then excluding certain balance-sheet line items, including acquisition-related fees and expenses, deferred financing costs, non-cash mark-to-market adjustments, and non-cash compensation.

42.     ARCP repeatedly stressed to investors the importance of its reported AFFO throughout the Relevant Period.  In its SEC filings, proxy materials, press releases, presentations, and conference calls, the Company represented that its reported AFFO allowed investors to evaluate the sustainability of ARCP's long-term operating

---

Realty Finance Trust, Inc. (Chairman and CEO); American Realty Capital – Retail Centers of America, Inc. (Chairman and CEO); AR Capital Acquisition Corp. (Chairman); American Realty Capital Trust IV, Inc. (Chairman and CEO); Cole Corporate Income Trust, Inc. (Chairman, President and CEO); Cole Credit Property Trust, Inc. (Chairman, President and CEO); Cole Credit Property Trust IV, Inc. (Chairman, President and CEO); Cole Credit Property Trust V, Inc. (Chairman, President and CEO); Cole Office & Industrial REIT, Inc. (Chairman, President and CEO); Cole Real Estate Income Strategy, Inc. (Chairman, President and CEO); Phillips Edison – ARC Grocery Center REIT II (CEO); and Business Development Corporation of America (Chairman and CEO) .

performance and to compare ARCP's performance with other companies, many of which did not have the Company's level of merger and acquisition activity.  In its 2013 Form 10-K, for example, ARCP stated:

> By providing AFFO, we believe we are presenting useful information that assists investors and analysts to better assess the sustainability of our ongoing operating performance without the impacts of transactions that are not related to the ongoing profitability of our portfolio of properties.  We also believe that AFFO is a recognized measure of sustainable operating performance by the REIT industry. Further, we believe AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies that are not as involved in activities which are excluded from our calculation.

43.    All of the Company's SEC filings during the Relevant Period reported the Company's purported AFFO, with each of them including a table that supposedly described how the Company calculated its AFFO each quarter.  ARCP represented in these filings that it calculated AFFO based on FFO according to the industry-standard definition of FFO set forth in the White Paper on FFO approved by the Board of Governors of NAREIT, as revised in February 2004.

44.    ARCP issued press releases and financial statements that reported "record" AFFO.  Moreover, the Company's AFFO regularly beat its competitors and exceeded analysts' estimates, including during each quarter of 2012, 2013 and 2014.  On August 1, 2012, for example, ARCP reported AFFO for the third quarter of 2012, which was over 100% greater than the AFFO ARCP reported for the second quarter of that year.  On May 6, 2013, ARCP reported AFFO for the first quarter of 2013 of nearly $31 million, which was 811% greater than the prior quarter.  Then, in the third quarter of 2013, ARCP reported AFFO of $47 million, which was a 42% increase from the prior quarter.  On

February 27, 2014, the Company again reported "record" financial results and fourth quarter AFFO of $56 million, which was over 150% more than the AFFO from the corresponding prior year period.  On May 8, 2014, the Company reported a record-high AFFO of $147 million for the first quarter of 2014, which was 330% greater than what it had reported for the same period in 2013.  Finally, on July 29, 2014, the Company reported yet another record-high AFFO of $205 million for the second quarter of 2014, which was 429% greater than what it had reported for the same period in 2013.

45.    In showcasing the Company's reported AFFO during the Relevant Period, ARCP made numerous references "highlighting" AFFO in the press releases accompanying the filing of its quarterly and annual financial results.  In the press releases accompanying the disclosure of ARCP's financial results for 2013, as well as the first and second quarters of 2014, for example, the Company always included as a "highlight" its "increased AFFO."  When commenting on the financial results in the press releases, the Executive Defendants touted AFFO as a cornerstone of the Company's financial performance:

- Defendant Block:  "With strong AFFO per share growth, an attractive property portfolio, strong credit tenants bounded by long-term net leases and an attractively positioned balance sheet, we believe ARCP has the catalysts to provide long-term shareholder returns."

- Defendant Schorsch:  "We had a record quarter with earnings coming exactly in line with our expectations of $0.26 AFFO per share, consistent with our previously stated guidance for the year."

- Defendant Kay:  "The daily execution of these collective actions allows us to maintain our 2014 AFFO per share guidance of $1.13 - $1.19, while significantly de-levering the balance sheet and maximizing value for our stockholders."

46.     Analysts relied heavily on the Company's reported AFFO in evaluating ARCP's financial condition and stock price.  Barclays Capital, the Company's financial advisor, assessed the value of ARCP by "calculat[ing] and analyz[ing] ratio of its current stock price to its calendar year 2014 estimated AFFO based on Wall Street research consensus estimates."  Research analysts at Ladenburg Thalmann, BMO Capital Markets, and JMP Securities similarly evaluated ARCP's stock on a price-to-AFFO basis.  In one analyst report, for example, JMP Securities concluded that ARCP's price-to-AFFO multiple of 11-times AFFO – in comparison to its peer group, which had an average price-to-AFFO multiple of 15 times – made ARCP a "must own" stock.

47.     Unknown to investors at the time, the Company's reported AFFO was not a reliable metric to assess ARCP's true value, the sustainability of its operating performance, or its performance relative to its competitors.  The Company's reported AFFO, in fact, bore little resemblance to its true financial condition and misled investors into believing that ARCP was an attractive REIT to own.

48.     As ARCP has now admitted, the financial data it issued to investors during the Relevant Period were materially false and misleading and "should no longer be relied upon."

49.     ARCP has acknowledged that the Company's Relevant Period financial statements were replete with accounting errors and/or manipulations, including without limitation overstated AFFO, every year during the Relevant Period, with the overstatements in individual quarters reaching as high as 95%.  ARCP also has admitted

that it understated net losses attributable to stockholders during the Relevant Period, with the understatements in individual quarters reaching as high as 18%.

50.     As discussed herein, ARCP has restated its GAAP financial statements to correct numerous violations of GAAP and financial reporting standards, including:

(a)     Classifying ordinary business expenses as "merger-related," which improperly inflated AFFO and gave investors the false impression that such expenses were non-recurring.  As restated, the expenses were reclassified as general and administrative expenses.

(b)     Recording expenses in the incorrect accounting period, thus delaying expense recognition and understating reported expenses.

(c)     Improperly classifying management fees to affiliates as being related to mergers or other non-routine transactions, which camouflaged related-party transactions, inflated AFFO, and gave investors the false impression that such expenses were non-recurring.  As restated, the expenses were reclassified as management fees to affiliates.

(d)     Recording deferred financing costs as merger and other transaction-related expenses.

(e)     Recording payments to Schorsch-controlled entities as being for the acquisition of furniture, fixtures and equipment, and including those purported assets on its books, even though there was "no evidence of the receipt" to substantiate the existence of any such assets.  The Company restated the payments by writing off the amounts.

(f)     In addition, as detailed herein, ARCP had inadequate and deficient internal controls, which permitted the misstatement of its financial results and reported AFFO.  Among these deficiencies were (i) the lack of controls preventing senior management from changing ARCP's financial statements without a proper basis, review and approval; and (ii) a lack of control over the formulation of the AFFO and the evaluation of the Company's ability to meet AFFO guidance.

51.     Despite such accounting errors and the lack of key financial controls, Defendants Schorsch and Block certified to investors, for each quarter that ARCP has been a public company, that they had designed, reviewed, evaluated and found ARCP's

controls "effective" to prevent the very type of misstatements ARCP now has admitted occurred.

### C.    ARCP's Growth-by-Acquisition Campaign

52.    By reporting inflated and inaccurate AFFO results and through other material misstatements to investors, ARCP was able to secure capital infusions and garner investor support necessary to allow ARCP to go forward with its stated goal to convert the Company into an "acquisition machine."

53.    Defendant Schorsch succeeded in his efforts.  According to ARCP's SEC filings, between 2012 and 2013, ARCP's assets rose nearly 10-fold, from approximately $2.2 billion to $20.5 billion.  Moreover, in just three years, ARCP grew into one of the largest REITs in the country, with over $20.5 billion in assets.  This rapid expansion was the product of an aggressive merger-and-acquisition campaign, which ARCP was able to accomplish only through the sale to investors of billions of dollars of additional equity and debt securities.  In addition to the "epic" and remarkably expensive (even for this Company) acquisition of Cole on February 7, 2014, for $11.2 billion, the Company's acquisitions included:

- The acquisition of American Realty Capital Trust III, Inc. ("ARCT III") on February 28, 2013, for $2.3 billion;

- The acquisition of GE Capital Properties on June 28, 2013, for $774 million;

- The acquisition of CapLease, Inc. on November 5, 2013, for $2.2 billion;

- The acquisition of American Realty Capital Trust IV, Inc. ("ARCT IV") on January 3, 2014, for $3 billion;

- The acquisition of Fortress Group Properties on January 8, 2014, for $601 million; and

- The acquisition of Red Lobster properties on July 28, 2014, for $1.5 billion.

54.     Throughout ARCP's acquisition spree, it represented that each transaction was favorable to shareholders, added value to the Company, and increased the Company's AFFO.  In connection with the CapLease Merger, for example, Defendant Schorsch announced that "[t]he acquisition is expected to result in approximately 11% accretion to our AFFO in 2014" and that ARCP expected "to add $0.11 per share to our AFFO" as a result of the acquisition.  Similarly, in connection with the ARCT IV Merger, the Company announced an increase in AFFO estimates "equivalent to approximately 31% growth over 2013 [] AFFO per share."   ARCP further represented in connection with these purchases that the Company had the internal controls necessary properly to account for its acquisition activity and had a solid understanding of its financial condition.

55.     ARCP's largest and most prominent merger, as noted, was with Cole ("Cole Merger").  On October 22, 2013, ARCP and Cole entered into an Agreement and Plan of Merger ("Cole Merger Agreement"), which provided that Cole shareholders, including Plaintiffs, would receive 1.0929 shares of ARCP common stock or $13.82 for each Cole share.

56.     Defendants repeatedly represented to investors that the Cole Merger was beneficial to Cole and ARCP shareholders, urging Cole's shareholders to approve the merger and exchange their shares.  In SEC filings filed in connection with the Cole Merger, ARCP highlighted how the merger would result in "AFFO Growth."  In a press

release accompanying the Cole Merger, Defendant Schorsch stated that ARCP was the "new industry leader" and was committed to "drive value for stockholders by placing their interests ahead of our own, aligning pay with performance, and reporting fully and transparently." Schorsch further represented that the Cole Merger would enable ARCP to "deliver AFFO per share earnings accretion through further cost of capital advantages" and "improve our AFFO multiple." On a conference call with analysts and investors days later, Defendant Schorsch again touted the Cole Merger as "an epic transaction" and a "win-win to the shareholders." Defendant Block reiterated this point, telling investors that the Company's AFFO after the merger would be 11.13 to $1.19 per share."

57.     On November 5, 2013, ARCP filed with the SEC a registration statement on Form S-4/A related to the Cole Merger ("Cole Registration Statement"). On December 23, 2013, the Company also filed with the SEC a Joint Proxy Statement/Prospectus to Cole shareholders ("Cole Merger Proxy"). The Cole Registration Statement and Cole Merger Proxy made representations to investors regarding the Cole Merger, including financial data for ARCP for the first nine months ended September 30, 2013. The materials represented that the "unaudited financial statements include all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the interim September 30, 2013 financial information."

58.     In addition, the Cole Merger Agreement – which was attached to both the Cole Registration Statement and the Cole Merger Proxy and was incorporated by reference in both documents – represented that ARCP's SEC filings and the financial data within those filings were free of material misstatements and omissions. They further

represented that ARCP had a system of internal accounting controls that was effective, reliable, and sufficient to ensure that ARCP's financial statements were accurate.  Among other things, they assured investors that ARCP and its executives had "devised and maintain a system of internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP."

59.    The Cole Merger closed on February 7, 2014.  Plaintiffs, relying on Defendants' representations and along with other investors, voted in favor of the Cole Merger and exchanged their Cole shares for ARCP shares.  Concealed from Cole shareholders deciding whether to cast their votes in favor of the Cole Merger, including Vanguard, ARCP's financial performance was "faltering," it was overstating its AFFO by material amounts, and it lacked the represented financial controls necessary to ensure its disclosures were truthful and complete.

### D.    Defendant Schorsch's Empire and ARCP's Executives Profit from ARCP's Acquisition Binge

60.    The ARCP "acquisition machine" was designed to and did effectively transfer hundreds of millions of dollars from the Company to entities owned or controlled by Defendants Schorsch, Block, and other senior executives.  Over a period of just three and half years, the Company paid ARC Properties Advisors, LLC ("ARC Advisors," headed by Schorsch) and its affiliates over one billion dollars – largely for supposedly acquisition-related "commissions," "fees," "services," and "expenses."    Schorsch's complex and opaque web of interrelated companies included such similarly named affiliates as ARC Advisors; AR Capital; RCS Capital; RCS Capital Corporation; RCS

Securities; RCS Advisory Services, LLC; ARC Advisory Services, LLC; American Realty Capital Advisors III; American Realty Capital Advisors IV, LLC; American National Stock Transfer, LLC; and ARC Real Estate Partners, LLC.

61.     In 2013 and 2014, for example, ARCP incurred fees and expenses payable to ARC Advisors "and its affiliates" for services related to its mergers with ARCT III and ARCT IV.  ARCP incurred $94 million in costs related to the ARCT IV merger payable to ARC-related entities for items such as "strategic advisory services" and "subordinated distribution fees."  In 2013, in connection with the ARCT III merger, ARCP incurred fees and expenses of over $106 million payable to ARC-related entities.  ARCP paid a subsidiary of AR Capital over $98 million in 2013 as an "incentive fee" in connection with the ARCT III merger.

62.     Two of ARCP's final cash transfers to ARC Advisors and its "affiliates" underscore Defendants' fraudulent scheme to deceive shareholders in order to tax the Company with hundreds of millions of dollars in improper fees and services, thus lining the pockets of Schorsch, Block and other senior executives.  In 2014, the Company paid $20 million to ARC Advisors and its affiliates solely to switch from external management to internal management.  This $20 million was evenly split between "post-transaction support services" and "furniture, fixtures, and equipment," which the Company acknowledged could not be substantiated or supported by documentary evidence.  ARCP's transition to self-management was "a condition to closing the merger" with Cole.

63.     Similarly, in connection with the Cole Merger, Schorsch's entities obtained a $32 million payout, including $28 million to Realty Capital Securities LLC, an entity owned by AR Capital, for "financial advisory and strategic services"; $2.9 million to RCS Advisory Services, LLC, a subsidiary of RCAP, for "transaction management services"; and $750,000 to ANST for "[r]etention as non-exclusive advisor and information agent."   ARCP paid a subsidiary of RCAP, Realty Capital Securities, LLC, $46.9 million between January 2013 and May 2014 for "investment banking and strategic advisory services" related to the Cole Merger.

64.     RCS Capital, another Schorsch-Controlled Entity, entered into a letter agreement with ARCP pursuant to which RCS Capital agreed to act as financial advisor to ARCP in connection with the Cole Merger.  RCS Capital attended numerous meetings of the ARCP Board of Directors in connection with the Cole Merger and participated in discussions regarding the offering and purchases of Cole shares.

65.     The Company's executives also profited personally from ARCP's acquisition binge.  Over intense shareholder objections, including Vanguard's opposing vote, the Company adopted a 2014 Multi-Year Outperformance Plan ("OPP"), which tied executive compensation to the Company's size and reported AFFO.   When the Company's stock price rose as it acquired more companies and recorded higher AFFO, the Company's executives profited.

66.     More specifically, the OPP was divided into two components:   one "absolute" and one "relative."   Each component was measured over a three-year period based on share-price appreciation and common-stock distributions.  If ARCP achieved a

total return to stockholders of more than 7% a year, the plan paid out 4% of the dollar amount of the total return exceeding that benchmark. Further, if the Company's annual performance exceeded the median total return of a group of peer companies by six percentage points or more, then the OPP paid out an additional 4% of that excess total return. Under the second "relative" component, the plan paid participants (including Defendants Schorsch and Block) 50% of their incentive compensation even if the Company posted no cumulative return to stockholders. Notably, the Compensation Committee allocated the bulk (42.5%) of the OPP's $120 million executive-incentive compensation pool to Defendant Schorsch.

67.     In total, the proposed OPP provided an executive-incentive compensation pool of $222.1 million for 2014, with 42.5% of the pool allocated to Defendant Schorsch. This incentive compensation was in addition to (i) Defendant Schorsch's base salary of $1.1 million for 2014; (ii) an estimated $8.8 million of nonguaranteed cash bonus and equity awards; and (iii) a "retention grant" worth $24.9 million. Defendant Schorsch's total awarded compensation for 2014 alone was estimated at $28.4 million, assuming he achieved only the midrange of the OPP plan, or almost 26 times his guaranteed salary of $1.1 million.

68.     ARCP adopted the OPP, notwithstanding a 67.6%, non-binding, shareholder vote rejecting the OPP and a May 16, 2014, Institutional Investor Services ("ISS") report criticizing the plan. As the ISS explained, the OPP plan was not "rigorous relative to the potential payout values." ARCP nevertheless adopted the OPP, with a recently disclosed December 12, 2014, agreement between Schorsch and ARCP revealing

an "Award Agreement dated January 8, 2014, under the ARCP 2014 Multi-Year Outperformance Plan."  Through this OPP – as well as various other forms of compensation, director fees, and profit arrangements that accompanied each acquisition – the ARCP Executive Defendants personally profited from their fraud.

      **E.**      **As Concealed from Investors, Defendants Intentionally Misstate the Company's AFFO**

69.      As noted, AFFO is a basic financial metric commonly used by investors to evaluate the financial health of a REIT, and is often equated to "earnings per share" for non-REIT companies.  AFFO is a non-GAAP metric that is calculated based on FFO (Funds From Operations, another non-GAAP metric), which in turn is calculated based on net income under GAAP.  FFO and AFFO are useful metrics for investors because net income under GAAP is calculated based on the assumption that assets will depreciate over time, and that assumption is not necessarily true of real estate.  FFO excludes from net income gains (or losses) from sales of property, as well as depreciation and amortization of real estate, in order to provide a measure of operating profits that accounts for the fact that real estate frequently increases in value over time rather than depreciating.  AFFO, in turn, is calculated based on FFO with adjustments to make it a more accurate measure of the cash generated by a REIT, and its capacity to pay dividends to investors.  The industry standards for calculating FFO – upon which the calculation of AFFO depends – are set forth in a White Paper published by the National Association of Real Estate Investment Trusts ("NAREIT").  As noted, ARCP represented that it calculated FFO (and in turn AFFO) according to the industry standards set forth by NAREIT.  According to those industry standards, when calculating AFFO for properties

for which a REIT has only a partial ownership interest, the adjustments to net income must be proportional to that partial ownership interest.  That is, if a REIT's net income from a property is only part of the net income generated by the property as a whole, because the REIT has a partial interest in the property, the adjustments to net income likewise must be reduced in proportion to the REIT's partial interest in the property.

70.     AFFO may be calculated using either a "gross" or a "net" method.  When using the gross method, one first calculates the net income for the entire property, then makes adjustments by the gross reported amounts for the entire property, and finally calculates the REIT's proportional share of the adjusted amount.  When using the net method, one first calculates the REIT's proportional share of net income, and then makes adjustments that are attributable only to the REIT's proportional interest in the property.

71.     Unknown to investors until recently, ARCP's representations of its AFFO were false.  One trick underlying ARCP's inflated AFFO figures was that it calculated FFO using the entirety of the added-back costs, including the portion thereof that should have been attributed to non-controlling interests in the Operating Partnership.  That is, it added back depreciation and other costs to its net income associated with the Operating Partnership as if it owned the Operating Partnership in its entirety, when in fact it owned 96.1% of the Operating Partnership.  In so doing, the Company materially overstated its AFFO and provided investors with a distorted picture of the Company's financial condition and the supposed benefits of the Company's numerous acquisitions.  Then, as ARCP's former CAO, Defendant McAlister, explained in a December 18, 2014, verified complaint, the Company began calculating AFFO on a gross basis rather than a net basis.

This change, McAlister admitted, was made "suddenly and without any apparent justification or basis," and it helped the Company to mask its improper failure to adjust its added-back amount to account for its partial ownership interest in the Operating Partnership.

72.     ARCP changed its AFFO, Defendant McAlister explained, to mask its financial condition, which was unknown to investors at the time.  Contrary to its repeated claims of "record" AFFO and successful acquisitions, the Company's financial performance was "faltering" during the Relevant Period and its acquisitions were a negative drain on its bottom line.  The Company's accounting improprieties, as Defendant McAlister has admitted, were necessary "to avoid public disclosure of the Company's faltering financial performance."

73.     ARCP's top executives were fully aware of, and participated in, the Company's fraudulent accounting.  As set forth in Defendant McAlister's verified complaint, when she alerted the Company's former CEO, Defendant Kay, to the Company's improper accounting of AFFO, he directed her and Defendant Block "not to change or correct the fraudulent reports."  Defendant Schorsch similarly instructed Defendants Block and McAlister not to correct the Company's fraudulent financials.  As McAlister recounted, on or about July 28, 2014, Defendant Schorsch "directed Mr. Block [during a telephonic conference call] to conceal the previous improper reporting."

74.     The Company perpetuated its accounting fraud by devising ways to conceal it from investors.  According to Defendant McAlister, Defendant Schorsch instructed CFO Defendant Block "to take steps to cover up the improper change in accounting and

unlawfully misleading financial reports." Defendants Schorsch and Kay also directed Defendants Block and McAlister to "change[] the beginning point for its AFFO calculation from 'net loss attributable to stockholders (in accordance with U.S. GAAP)' to 'net loss (in accordance with U.S. GAAP).'" The goal of those changes, Defendant McAlister has revealed, was to "ma[k]e it more difficult for stockholders to see the fraudulent change in the add-backs of non-recurring transaction and deferred financing costs."

75.     ARCP and its top executives also threatened, intimidated, and terminated employees who attempted to interfere with the Company's fraud. Defendant McAlister has explained how she "repeatedly expressed her concerns regarding Mr. Schorsch's instruction to shift and reallocate the funds in the 2014 Q2 report." When these issues were raised, however, "members of senior management either ignored Ms. McAlister's concerns regarding erroneous accounting practices, or berated Ms. McAlister for calling attention to them."

## F.     ARCP's Audit Committee Discloses Fraud

76.     Investors began to learn the facts about ARCP's accounting fraud on October 29, 2014. That morning, ARCP issued a press release that contained a series of startling admissions. The press release revealed for the first time that the Company's Audit Committee had conducted "an investigation into concerns regarding accounting practices and other matters." Based on its investigation, the Audit Committee concluded that the Company's previously issued financials "should no longer be relied upon, including its financial statements for 2013 and the first and second quarters of 2014."

77.     The Audit Committee retained independent counsel and forensic experts to conduct the investigation.   Through their investigation, the Audit Committee determined that the Company incorrectly included certain amounts related to its non-controlling interests in the calculation of AFFO" and, as a result, overstated AFFO.   The Audit Committee further found that "this error was identified but intentionally not corrected, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014."

78.     The Audit Committee also revealed that the Company's CAO, Defendant McAlister, and CFO, Defendant Block, had been terminated.   These officers, the Audit Committee made clear, were implicated and responsible, at least in part, for the Company's accounting fraud.   Indeed, because of those Defendants' "key roles in the preparation of [ARCP's] financial statements," the Audit Committee concluded that the Company's earlier financials prepared by these Defendants merited additional review and should not be relied upon.   The Audit Committee cautioned that the Company's upcoming review "could identify further required adjustments in addition to those discussed above."

79.     The Company's Audit Committee further found that ARCP's internal controls over financial reporting were materially deficient.   The Audit Committee explained that "the Company is reevaluating its internal control over financial reporting and its disclosure controls and procedures" and "intends to make the necessary changes

to its control environment to remediate all control deficiencies that are identified as a result of the ongoing investigation and the restatement process."

80.     After issuing its press release on October 29, 2014, ARCP held a conference call with investors to discuss the Company's revelations.  During the call, Defendant Kay adopted and repeated the Audit Committee's findings set forth in the Company's press release.  He explained how, on September 7, 2014, an ARCP employee contacted the Audit Committee and reported accounting improprieties.  He further explained that, for the first quarter of 2014, AFFO was supposed to be calculated on a "net" basis, with any adjustments to net loss multiplied by approximately 96.5% to reflect ARCP's interest in the Operating Partnership.  As Defendant Kay admitted, however, ARCP improperly calculated AFFO during the first quarter of 2014 using adjustments to net loss based on the full results of the Operating Partnership.  As a result, ARCP added back more adjustments than it should have, which resulted in an improperly inflated AFFO.  Defendant Kay further admitted that the Company's fraudulent accounting improperly increased AFFO for the first quarter of 2014 by $17.6 million, artificially inflating AFFO to $0.26 per share when it should have been only $0.23 per share.  The Company again fraudulently manipulated its financials in the second quarter of 2014 by, among other things, moving approximately $10.5 million of second quarter 2014 expenses to the third quarter of 2014 to "conceal the error from the first quarter."  In so doing, the Company reported an artificially low net loss for the second quarter of 2014.  As Defendant Kay acknowledged, "we had some bad judgment there."  Defendant Kay attempted, however, to assure the market that the Company had the issue under control

and that "[n]one of the executives that are currently at the Company have been implicated during the investigation related to the concealment of that error."

81. Analysts were stunned by the Company's October 29 disclosures. Wells Fargo Securities reported that "this morning's announcement will be a significant setback for the company in terms of earning or maintaining investor trust, credibility, and allaying investor skepticism." Analysts at JPMorgan Securities further concluded that, as a result of the revelation of the accounting fraud, "[ARCP]'s credibility is likely impugned for some period of time," and "capital costs will be higher in the near term . . . thus making growth more difficult." Commentator Jim Cramer remarked that, when he read the Company's disclosure, his "heart jump[ed] out of [his] throat" because the October 29 disclosure made clear that ARCP's senior executives "knew and did nothing" to correct the Company's misstatements.

82. Credit-rating agencies also responded swiftly to the Company's disclosures. Within hours of the news, S&P placed ARCP's debt rating on downgrade "watch." Moody's also placed the Company's corporate debt rating under review, explaining that the "purposeful hiding of the accounting error engenders questions about the company's credibility and maintenance of investor trust."

83. Federal and state regulators also responded to the Company's revelations. After the close of trading on October 29, 2014, The Wall Street Journal reported that the SEC "intends to launch an inquiry into the accounting irregularities" at ARCP. As The Wall Street Journal explained: "The revelation is a black eye for Mr. Schorsch, chairman of ARCP Capital and one of the biggest real-estate investors in the U.S." On October 31,

2014, Reuters reported that the FBI and the U.S. Attorney's Office for the Southern District of New York had now "opened a criminal probe of [ARCP] in the wake of the real estate investment trust's disclosure that it had uncovered accounting errors."

84.    The Company's October 29 revelations caused the price of ARCP's stock to decline markedly.  On the day of the press release, ARCP's stock price dropped from $12.38 to $10.00, a decline of more than 19%, on extremely high trading volume of 231 million shares.  The stock price fell by an additional 21% during the next three trading days, as more revelations were made and the impact of the accounting fraud was further appreciated by investors.  In total, the Company's disclosures caused the Company's stock price to fall by over 36% in only three trading days.

### G.    Defendants Schorsch, Kay and Beeson Unexpectedly "Resign"

85.    On December 15, 2014, the Company announced that its founder, Defendant Schorsch, its CEO, Defendant Kay, and its COO, Defendant Beeson, all had "resigned," effective immediately."  The press release announcing these "resignations" made clear that the Company's Board of Directors wanted no further dealings with these executives.  It explained that those executives were immediately relieved from their "employment or board positions held with the Company, its subsidiaries and certain Company-related entities."  The press release further stated:  "In connection with Mr. Schorsch's departure as Executive Chairman, ARCP will be unwinding all of its relationships with entities in which Mr. Schorsch maintains an executive or director-level role or is a significant stockholder."

86.     Thus, within six weeks of the October 29 disclosure, every senior executive employed by the Company at the end of the Relevant Period – its Chairman, CEO, COO, CFO, and CAO – had been asked to leave the Company or been terminated, with the former CAO suing the Company for reporting the accounting fraud.

**H.     ARCP Confirms That Its Internal Controls Were Faulty and That It Falsified Four Years of Financials**

87.     On March 2, 2015, ARCP's new management issued a press release and held an investor conference to announce the final results of its restatement (the "Restatement").   The Restatement revealed that ARCP's misrepresentations of its financial performance went back to the very beginning of its history as a public company. ARCP admitted in the Restatement that its controls over financial reporting and disclosure had suffered – and continued to suffer – from a "material weakness."  A "material weakness," the Restatement explained, "is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis."  The Company admitted that its "disclosure controls and procedures were not properly designed or implemented to ensure that the information contained in the Company's periodic reports and other SEC filings correctly reflected the information contained in the Company's accounting records and other supporting information, and in the case of AFFO per share (a non-GAAP measure that is an important industry metric) was correctly calculated."  On this subject, the Company further admitted that "the Company did not have appropriate controls to ensure that its SEC filings were reviewed on a timely basis by senior management or that

significant changes to amounts or other disclosures contained in a document that had previously been reviewed and approved by the Audit Committee were brought to the attention of the Audit Committee or its Chair for review and approval before the document was filed with the SEC." The Company also admitted that it "did not have appropriate controls over the formulation of AFFO per share guidance or the periodic re-assessment of the Company's ability to meet its guidance."

88.     The Company further admitted that "AFFO was overstated for 2011, 2012, 2013 (including each fiscal quarter of 2013) and the first two quarters of 2014." In other words, ARCP falsely reported AFFO throughout the entirety of the Company's four-year history as a public company. The Restatement quantified the material amounts by which ARCP overstated the Company's AFFO each year. In 2011, AFFO was overstated by 7.8%; in 2012, AFFO was overstated by 2.3%; in 2013, AFFO was overstated by 22.8%; in the first quarter of 2014, AFFO was overstated by 35%; and, in the second quarter of 2014, AFFO was overstated by 10.4%.

89.     The Company further admitted that it "did not maintain the appropriate controls to assess, authorize and monitor related party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates." As the Company explained: "Without the appropriate controls, the Company made certain payments to the Former Manager and its affiliates that were not sufficiently documented or that otherwise warrant scrutiny." The Company further explained: "The Audit Committee's investigation identified certain payments made by the Company to the Former Manager or its affiliates that were not sufficiently

documented or otherwise require scrutiny," including lease payments of $8.5 million relating to a former manager in a building located in Newport, Rhode Island, that the Company never occupied.

90.     In addition, the Company admitted that it "did not maintain appropriate controls over various grants of equity-based compensation."  The Company recounted: "In the fourth quarter of 2013, in anticipation of the Company's transition to self-management, the Company entered into employment agreements with the Company's former Executive Chairman and Chief Executive Officer and its former Chief Financial Officer . . . and also approved the 2014 Multi-Year Outperformance Plan pursuant to which awards were made to them on January 8, 2014."  Because the Company lacked "the appropriate controls, these documents contained terms that were inconsistent with the terms authorized by the Compensation Committee."  In addition, "the Company did not obtain copies of or administer the equity awards made by means of block grants allocated by the Former Manager and its affiliates, nor did it review the awards for consistency with the Compensation Committee's authorization."

91.     The Company also confirmed in its Restatement that the SEC had "commenced a formal investigation and issued subpoenas calling for the production of various documents" and that "the United States Attorney's Office for the Southern District of New York contacted counsel for the Audit Committee and counsel for the Company with respect to this matter, and the Secretary of the Commonwealth of Massachusetts issued a subpoena calling for the production of various documents."

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS

92.    Defendants made materially false and misleading statements and omissions concerning ARCP's financial performance and condition, and the effectiveness of its internal controls.   Those misstatements caused ARCP shares to trade at artificially inflated prices, and allowed the Company to carry out its "growth by acquisition" strategy using inflated ARCP shares as currency, generating hundreds of millions of dollars in transaction fees and incentive compensation for Schorsch and other senior executives. As explained in detail below:

(a)    ARCP's financial statements were materially false and misleading and did not accurately reflect the Company's financial performance. In an effort to avoid public disclosure of ARCP's faltering financial performance, Defendants changed, among other things, ARCP's historical AFFO-calculation methodology, resulting in ARCP's reported AFFO, AFFO per share, net income and earnings per share being materially inflated and false;

(b)    Defendants did not, as represented in financial statements, calculate AFFO using the industry-standard measure of FFO.   Rather, Defendants intentionally and improperly added back costs that were not associated with ARCP's ownership interest in the Operating Partnership;

(c)    Defendants had no reasonable basis to believe, and did not believe, their statements detailed herein about the Company's financial performance and AFFO calculations;

(d)    As ARCP admitted in connection with its restatement, ARCP's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(e)     ARCP's rapid pace of mergers and acquisitions during the Relevant Period "had a severe impact on the Company's control environment" and exacerbated the deficiencies in ARCP's internal controls and financial reporting processes;

(f)     Defendants' "growth by acquisition" strategy was not beneficial for ARCP shareholders, but instead was designed to generate purported transaction fees for Schorsch-controlled companies and to result in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction; and

(g)     As ARCP admitted in connection with its restatement, ARCP's internal control over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates; (ii) maintain adequate controls over various grants of equity-based compensation; (iii) implement consistent policies and procedures relating to purchase accounting; (iv) establish clear reporting lines and job responsibilities or promote accountability over business process control activities; and (v) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates.

## A.     ARCP's IPO

93.     ARCP became a publicly traded company on September 7, 2011.  In its IPO, the Company sold 5.58 million shares of common stock at $12.50 per share for proceeds of $69,750,000.   The registration statement for ARCP's IPO (the "IPO Registration Statement") represented that FFO was "a useful indicator of the performance of a REIT" and "that the use of FFO, together with the required GAAP presentations, provide a more complete understanding of our performance relative to our peers and more informed and appropriate bases on which to make decisions involving operating, financing, and investing activities."   The IPO Registration Statement also stated that

ARCP had prepared its financial statements "in conformity with accounting principles generally accepted in the United States of America [which] requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period."

### B.     Third Quarter 2011 Financial Results

94.     On November 14, 2011, ARCP issued a release announcing its financial results for the third quarter, ended September 30, 2011 ("3Q11").  The Company reported 3Q11 AFFO of $287,000, or $.017 per share, and a net loss of ($634,000) or ($0.42) per share.

95.     On November 14, 2011, ARCP also filed with the SEC its Form 10-Q for the period ended September 30, 2011 (the "3Q11 Form 10-Q").  The 3Q11 Form was signed by Defendants Schorsch and Block and reiterated ARCP's previously reported financial results.  It also represented that these financial results were accurate and presented in accordance with GAAP.  In addition, the 3Q11 Form 10-Q (and each of ARCP's quarterly and annual reports filed with the SEC described herein) contained certifications signed by Defendants Schorsch and Block pursuant to § 302 of the SOX, which certified:

- "[T]his report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which statement were made, not misleading with respect to the period covered by this report."

- "Based on [their] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the